439 So.2d 1113 (1983)
Carolyn PINKNEY, Individually and on behalf of her Deceased Husband, James Pinkney
v.
Alfred MILLER and New Orleans Public Service, Inc.
No. CA-0598.
Court of Appeal of Louisiana, Fourth Circuit.
September 21, 1983.
Writ Denied January 16, 1984.
Barry J. Sallinger, Kernan A. Hand, New Orleans, for plaintiff-appellee.
C.B. Ogden, II, James Maher, III, New Orleans, for defendants-appellants.
*1114 Before REDMANN, SCHOTT, BARRY, CIACCIO and WARD, JJ.
BARRY, Judge.
Plaintiff's husband was shot and killed by another passenger on a bus owned by the defendant, New Orleans Public Service, Inc. (NOPSI). The trial court found that, at the time the assailant boarded the bus, its driver had sufficient reason to anticipate the criminal attack and failed to prevent it. NOPSI appeals urging that the wrong standard of care was applied to its alleged negligence.
This senseless incident is described in the trial court's Reasons:
Plaintiff, Carolyn Pinkney, and her deceased husband, James Pinkney, boarded the New Orleans Public Service, Inc. South Claiborne bus on July 2, 1979, as fare-paying passengers. The Pinkneys had attended a concert earlier in the evening on one of the commercial riverboat cruises and were returning to their home. At the corner of South Claiborne Avenue and First Streets, a person later identified as Ernest Scott boarded the bus. Scott entered the bus and walked to the back door, where he stood leaning against a handrail.
When the Pinkneys reached their destination at the service stop on the corner of Washington Avenue and South Claiborne, James Pinkney exited the rear door followed by his wife, Carolyn. At that point, Scott reached out, blocking the passage of Mrs. Pinkney. When James Pinkney turned and saw what was happening, he asked Scott, `What's wrong with you?' and told him, `Let my wife pass.' Scott then approached Mrs. Pinkney and grabbed her around her waist. James Pinkney reentered the bus and poked his umbrella at Scott. Scott then drew a handgun from a shoulder bag he was carrying and fired three shots, two of which struck James Pinkney, who died as a result of those injuries.[1]
The crucial issue concerns the bus driver's allowing Scott, the assailant, to board the bus and the driver's ability and responsibility to foresee and prevent the assault. Our review concerns the trial court's factual determination of NOPSI's negligence and application of the appropriate standard of care as to NOPSI's liability.
Plaintiff's and defendants' witnesses differed in their observations of Scott when he boarded the bus and his behavior thereafter. Plaintiff testified she and her husband were talking when they heard noise outside the bus while it was stopped at First Street to pick up passengers. Plaintiff said the noise sounded like people arguing, but she could not see how many people were outside at the stop and who was arguing. She did not notice how many people boarded the bus at First Street but did observe that Scott stumbled on a step and grabbed the handrail as he got on. She further recalled Scott did not pay his fare and he immediately walked to the rear of the bus and stood on the first step by the back door. Although plaintiff and her husband were sitting midway in the bus, Mrs. Pinkney observed that Scott's "eyes were all bugged, and he was all raggy ... he was just out of it." She guessed Scott "was under the influence of some drug, not just alcohol."
Plaintiff testified Scott did not utter a word from the moment he boarded the bus until after the shooting. She said Scott did not make any threatening or obscene gestures and did not create any disturbance or problem until she tried to exit at Washington Avenue.
Earl Clark, a witness for plaintiff, testified he was at a party with Scott earlier in the evening and Scott was sniffing PCP, an illegal drug. Clark, who denied using drugs, said he'd had a few beers but others, including Scott, were "really bombed out" on PCP. Clark was not qualified as a drug expert but testified based on his "street qualification."
Clark was at the bus stop on First Street and noticed Scott "talking loud to an old man" while waiting for the bus. Clark did not see Scott fighting or causing any trouble *1115 or threatening anyone at the stop. Contrary to Mrs. Pinkney's testimony, Clark recalled Scott sat down in a front seat and talked out loud before going to stand on the rear step. Clark agreed with plaintiff that Scott stumbled on the front step, but did not state whether or not Scott paid his fare.
Noland Hudson, another person at the party earlier in the evening, also offered opinion testimony that Scott took PCP and said "Scott's eyes were big ... he was wild."
Dr. Garey, a psychiatrist and drug expert for plaintiff, stated in about 10% of PCP users, a toxic reaction causing bizarre behavior occurs.[2] According to Dr. Garey, a person suffering such a reaction would probably exhibit three symptoms apparent to the lay observer: (1) a staggering gait; (2) "jerky movements very similar to a person heavily intoxicated with alcohol"; and (3) rolling or straining eyes. Dr. Garvey said people using PCP "appear as if they're drunk."
Adrian Pryor, the bus driver, contradicted Mrs. Pinkney's allegation that Scott did not pay his fare. Pryor asserted that, although he did not look at Scott's face or clothing as Scott got on the bus, he noted Scott paid his fare with a quarter and nickel. Pryor explained he did not observe Scott's appearance, yet recalled the exact coinage deposited in the fare box, because his job is to make certain riders pay the fare. Pryor testified: "I don't look at nobody. I look at the money or the transfers, and that's it." The Trial Judge found this statement "positively illogical" declaring, "For one to remember a particular trait or act performed by a certain individual, it is necessary to remember the individual who possessed the characteristic or performed the act. An observation of an act performed by a particular person cannot exist without some recollection of who that person was. The Court finds Mr. Pryor's testimony as to Scott paying his fare upon entering the bus to be unbelievable." While this Court is not persuaded that such selective attention and observation by a bus driver are incredible, plaintiff testified Scott did not pay his fare and we defer to the trial court's evaluation.
Pryor insisted he habitually did not look at passengers' faces and stated he did not see Scott's face or observe his alleged drunken or drugged appearance. Neither plaintiff nor any of her witnesses could contradict Pryor's account of what he actually observed or did not observe. However, the lower court disbelieved Pryor's testimony because it found the driver could not have observed the fare payment without noticing the appearance of the person who paid. More important, the Trial Judge placed great stress on Pryor's testimony that he had closed the bus door and was about to pull away from the stop at First Street when he heard a knock on the door. Pryor said: "It was the knock that really disturbed me" and caused him to reopen the door for Scott. The lower court seized on this statement and declared that: "It is not unreasonable to assume that when an event which startles an experienced driver occurs, it would at the very least spark his curiosity to look at the source of the disturbance. The Court finds it highly unlikely that Mr. Pryor did not look down the stairwell at the person whose knock `really disturbed' him." The trial court surmised: "Mr. Pryor undoubtedly allowed Scott to enter without paying because he wanted to avoid confrontation with a man in a drunken or drug induced state."
The trial court also found Pryor's testimony unreliable because the driver initially described his relationship with another passenger-witness, Phyllis Neveaux, as "just a talking friend," when, in fact, the two had a sexual relationship and she allegedly had borne two of his children. The lower court similarly discounted Ms. Neveaux's testimony which we find unilluminating because she didn't notice Scott's appearance or whether he paid his fare. Like all of the other witnesses, Ms. Neveaux testified Scott did not create a disturbance on the *1116 bus until Mrs. Pinkney attempted to disembark.
Eric Fobbs, a NOPSI supervisor, testified NOPSI's policy is to allow inebriated persons to ride, as long as they are not threatening or creating a disturbance. Fobbs said NOPSI "can't deny anyone a ride. A person, if he's intoxicated, can still ride the bus as long as he keeps himself quiet, you know, maintains a normal act." The bus driver said he does not try to determine if a prospective passenger who stumbles or staggers is drunk, handicapped, retarded, or on drugs. In line with NOPSI's policy, Pryor said he allows anyone to ride who can board the bus and does not bother anyone. Pryor did say he called the dispatcher a few times when a rider was asleep, in a drunken stupor, or otherwise unable to get off the bus at the end of the line. In the two years he'd driven a bus, Pryor said he called the dispatcher about three times a year to put drunks off the bus, but had never before had a fight on his bus.
In his Reasons the Trial Judge responded:
"It is also clear that Mr. Pryor had neglected even the lowest standard of care. When asked on direct examination by Mr. Maher, attorney for New Orleans Public Service, Inc., if an individual staggers onto his bus in a drunken state and breathes in his face, would he evict him. [sic] Mr. Pryor responded that if he pays his fare he can ride. This policy violates not only any legal requirement imposed on common carriers, but common sense as well."
We disagree that NOPSI's policy on intoxicated passengers is sub-standard, nor are we aware of any legal requirement that NOPSI deny such persons the right (opportunity) to ride. To the contrary, a common sense approach is necessary. Alcohol and drugs in our society are obviously a prevalent social problem that should be resolved depending on the circumstances; however, common carriers which knowingly permit passengers to ride while "under the influence" are not ipso facto guilty of negligence.
Jimmy Martinez, a police crime analyst, testified there were seven major incidents and five minor incidents reported on the South Claiborne bus route in 1979. Robert Dumbourian, NOPSI's scheduling manager, said there are about 4.8 million riders a year on the South Claiborne line and there is a demand for night service.
From this assortment of evidence the Trial Judge ruled:
The Court finds that on the morning [sic] of July 2, 1979, the driver of the New Orleans Public Service, Inc.'s bus, Adrian Pryor, had sufficient knowledge to anticipate that if Ernest Scott were allowed to enter the bus, injury to a passenger on the bus was a likely consequence. The Court is convinced that the duty owed by New Orleans Public Service, Inc. and its employee, Adrian Pryor, extended in this case to protect fare-paying passengers, James and Carolyn Pinkney, from imminent danger.
To support the finding of NOPSI's negligence, plaintiff argues the bus driver failed to exercise "reasonable care" in allowing the assailant to get on the bus. Accepting all of plaintiff's relevant evidence as true, the facts are:
Scott was talking loud before getting in the bus;
Scott knocked hard on the door to get in;
Scott stumbled while getting in;
Scott did not pay his fare;
Scott was in an obviously dazed condition.
Additionally, there is no question that Scott was not verbally or physically threatening, abusive, or disruptive while on the bus, and plaintiff said he never spoke a word to her or anyone else. There was no evidence or suggestion the driver knew or should have been aware Scott had a gun.
For years a common carrier has been saddled with the burden of exercising the "highest degree of care" and is liable for the slightest negligence. Gross v. Teche Lines, 207 La. 354, 21 So.2d 378 (1945). Additionally, if a fare-paying passenger was injured en route, the carrier bore the burden of exculpating itself from fault. *1117 This concept applied to vehicular accidents involving the public carrier or injuries received in its operation.
This Court adopted the "highest care" standard to injuries inflicted on passengers by others.[3] However, this line of jurisprudence has been expressly disapproved because of the lack of any connexity between transportation by public carriers and batteries upon passengers other than the location of the injuries. Rodriguez v. New Orleans Public Service, Inc. 400 So.2d 884 (La. 1981).
Our present standard of care for injuries wreaked on passengers by third parties was explained in Rodriguez:
Merely because the defendant will not be held to the highest degree of care to prevent intentional batteries upon its passengers does not mean that the law will absolve it from liability any time a passenger is attacked. Since defendant is essentially operating a business that permits the public to enter its premises, it should be held to the same duty as a reasonable business establishment with respect to hazards not associated with the peculiar nature of carriage of passengers.
Owners of businesses who permit the public to enter their establishments have a duty to exercise reasonable care to protect those who do enter. (Citations omitted) This duty extends to keeping the premises safe from unreasonable risks of harm or warning persons of known dangers.... When the independent, intentional tortious or criminal acts of a third person constitute the unreasonable risk, this duty does not require the proprietor to risk physical injury or civil or criminal liability by physical intervention. Rather, the duty can be discharged by the summoning of those entrusted by law with the power of immediately maintaining the peace, the police, at the time the proprietor knows or should reasonably know of the third person's intention and apparent ability to execute the intended acts. (Our emphasis) (Citations omitted)
Therefore, our test to determine NOPSI's negligence is: whether its driver exercised reasonable care in allowing Scott on the bus; whether the driver knew or should have known of Scott's intention to commit the battery; and whether the driver knew Scott had the ability to execute the intended act.
The fact that Scott was talking loud before getting in the bus and had to knock hard for the door to open is of no moment. Nor do we place great significance on his stumbling while getting in. It isn't clear what the bus driver's responsibility was if he knew Scott did not pay his fare, but that fact is not connected to the shooting.
Essentially, taking these four facts together, and coupled with Scott's dazed condition, did the driver exercise "reasonable care" in allowing him to get on the bus? These facts, which comprise plaintiff's case, must be considered with the other uncontested facts, namely, Scott outwardly presented no threat of harm, he was silent, and no one knew he had a gun.
From all of this evidence the Trial Judge said:
The law applicable to the duty incumbent upon common carriers of passengers is clearly set forth in Carter v. New Orleans Public Service, Inc., 305 So.2d 481 (La.1975). The Carter case reaffirmed the well established rule that common carriers are charged with the duty of exercising the highest (emphasis added) degree of care to their passengers and are liable for the slightest negligence causing injury to those passengers.
The Carter[4] "highest" standard was expressly held inapplicable to criminal attacks by third parties on public buses, Rodriguez, *1118 supra, and the lower court erred in its application here.
Further, under Rodriguez the defendant (NOPSI) and its driver did not have the burden of exculpating themselves from negligence; rather, it is incumbent on this plaintiff to prove defendant breached a legal duty to protect her and her husband from the risk of a criminal attack.
Even assuming, arguendo, that the driver violated NOPSI policy by allowing Scott to ride without paying his fare, there is no "ease of association" between the driver's failure to enforce the fare payment and Scott's subsequent attack.
Likewise, assuming the driver was fully aware of Scott's dazed condition (alcohol or drug-induced), the driver's action in allowing the then docile Scott to board the bus is not easily associated with the risk that he would become violent or have a concealed weapon and eventually shoot a passenger. A person's dazed condition certainly doesn't project the possibility or foreseeability of a criminal act.
Scott got on the bus at First Street and Mr. and Mrs. Pinkney attempted to get off at Washington Avenueonly four blocks later. During this extremely short distance, Scott got on the bus and walked to the rear. Mr. and Mrs. Pinkney got out of their seats and walked to the rear exit door. Without any notice or indication to the bus driver of his intentions, Scott interfered with Mrs. Pinkney's attempt to leave the bus, Mr. Pinkney struck Scott with an umbrella, and Scott shot Pinkney. Accepting all of this as uncontroverted and in the light only favorable to plaintiff, we find it impossible to conclude that the bus driver failed to exercise reasonable care simply by allowing Scott to enter the bus. There was no way for the driver to foresee that Scott would commit a homicide moments after he got on the bus. The driver did not know or should not have known of Scott's intent to harass Mrs. Pinkney or harm Mr. Pinkney (Scott never knew either one). The driver did not know Scott had the ability (a gun) to execute the intended act. Rodriquez clearly exonerates NOPSI from liability.
The district court judgment is reversed; judgment is entered in favor of defendants/appellants at plaintiff's costs.
REVERSED AND RENDERED.
WARD, J., dissents with written reasons.
WARD, Judge, dissenting.
I believe that the judgment of the Trial Judge should be affirmed because, as he stated in his reasons for judgment, the conduct of the NOPSI driver breached his duty to passengers that were present in the bus. The relevant findings by the Trial Judge which are noted in the majority opinion conclude:
It is also clear that Mr. Pryor had neglected even the lowest standard of care.... [he] had sufficient knowledge to anticipate that if Earnest Scott were allowed to enter the bus, injury to a passenger on the bus was a likely consequence.
I agree with the majority that the crucial issue in this case is whether the NOPSI driver breached his duty or violated a standard of care when he allowed Scott to board the bus. I believe that he did because, by his own testimony, the driver admitted he paid no attention to the appearance or conduct of Scott. He testified: "I look at no one ... all I do is pick up and take fares; my job is to pick up and transfer people; I look at nobody. I look at the money or the transfers...."
Relying on the testimony presented at trial, the majority describes what Adrian Pryor would have observed as to Scott's conduct:
1) Loud talking;
2) Hard knocking on the door;
3) Stumbling;
4) Refusing to pay;
5) Dazed [intoxicated] appearance.
Applying Rodriguez to these facts, the majority concludes that NOPSI and its driver should not be held liable for the *1119 intentional tortious act of Scott which admittedly caused the injury.
I believe that we can and should distinguish the Rodriguez case.
In Rodriguez, the tortfeasors had entered the bus without incident, and there was no indication whatsoever that those passengers would harm other passengers. In that case, the bus driver did not breach a duty to exclude as passengers persons who were potentially dangerous, and I agree with the conclusion of Rodriguez: the NOPSI driver is not required to intervene where "tortious or criminal acts" have erupted and the driver can discharge his duty by summoning the police at the time the driver knows of a "third person's intention and apparent ability to execute the intended acts." For injuries not arising from vehicular collisions, the Supreme Court in Rodriguez rejected the public carrier's "highest standard of care" and adopted the duty of "a reasonable business establishment." The Supreme Court in Rodriguez goes further, however:
Merely because the defendant will not be held to the highest degree of care to prevent intentional batteries upon its passengers does not mean that the law will absolve it from liability any time a passenger is attacked. Since defendant is essentially operating a business that permits the public to enter its premises, it should be held to the same duty as a reasonable business establishment with respect to hazards not associated with the peculiar nature of carriage of passengers.
Owners of businesses who permit the public to enter their establishments have a duty to exercise reasonable care to protect those who do enter. (citations omitted) This duty extends to keeping the premises safe from unreasonable risks of harm .... (citations omitted) (emphasis added)
I believe that the duty of reasonable care includes the duty to observe the conduct and demeanor of those who seek to enter the bus and to protect the patrons who are already in the bus, particularly where, as in a bus, the passengers have limited egress and minimal space to protect themselves. That duty of reasonable care includes the duty to deny admittance to the premises of patrons who are already violating the criminal statutes by public drunkenness.
The Rodriguez court noted the need for a public carrier to accept a wide range of behavior in the riding public and stated that "[t]he tolerance of a set level of decorum not involving criminality (emphasis added) ... is a business choice". I believe that passengers exhibiting public drunkenness, a criminal offense, need not be tolerated. I believe that the Supreme Court in Rodriguez dictates a different result from the result reached by this Court in Orr where the offending youths were "apparently drunk" when they entered the bus. I believe that Orr should be overruled.
While the duty of public transportation is to provide service to the riding public, that duty also must incorporate a protection of its passengers from erratic, volatile conduct of would-be riders who are already noticeably intoxicated. That duty does not extend to provide transportation to drunks.
Furthermore, the Trial Judge made a finding of fact: the conduct and demeanor of Scott should have notified a driver exercising reasonable care that Scott was publicly intoxicated, a criminal act, and likely to harm the passengers already aboard the bus; NOPSI's driver Pryor did not exercise reasonable care when he allowed an obviously intoxicated person to board the bus. The record does not show that the Trial Judge's finding of fact was manifestly erroneous.
I further disagree that there is no ease of association between the conduct of the driver and the harm to Pinkney. While the exact nature of the injury could not be reasonably foreseen, some injury through an intentional tort was foreseeable. Although the shooting death of Pinkney reaches the farthest risk of harm, Pryor's failure to exercise reasonable care in keeping the bus premises safe from harm breached a duty that could easily be associated with the death of Pinkney. Like the other findings of fact, that conclusion by the Trial Judge is not manifestly wrong.
*1120 As the Trial Judge noted, the NOPSI open-door policy that allows drunks to ride "except when threatening" may be due for a re-examination since it arguably conflicts with a duty to provide reasonably safe public transportation. More particularly, it conflicts with a duty to exclude those who are violating City Ordinances that prohibit persons from being drunk in public.
NOTES
[1] Scott was killed by the police shortly thereafter.
[2] The record does not have a blood analysis or autopsy report on Scott.
[3] Aime v. Hebert, 282 So.2d 566 (La.App. 4th Cir.1973); Orr v. New Orleans Public Service, Inc., 349 So.2d 417, 418 (La.App. 4th Cir.1977); Imig v. New Orleans Public Service, Inc., 391 So.2d 72 (La.App. 4th Cir.1980) and Rodriguez v. New Orleans Public Service, Inc., 400 So.2d 917 (La.App. 4th Cir.), Reversed 400 So.2d 884 (La.1981)
[4] Carter involved injuries sustained when the bus driver allegedly slammed on his brakes due to a sudden emergency.